NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-267

STATE OF LOUISIANA

VERSUS

SAMUEL DELANEY

**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. CR04-3760
HONORABLE PATRICIA C. COLE, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of John D. Saunders, Elizabeth A. Pickett, and James T. Genovese, Judges.

AFFIRMED IN PART; REVERSED IN PART.

M. Michele Fournet
Attorney at Law
715 St. Ferdinand Street
Baton Rouge, LA 70802
Counsel for Defendant/Appellant:
    Samuel Delaney

**Douglas L. Hebert Jr.**
**District Attorney - 33rd J.D.C.**
**Joe Green, ADA, 33rd J.D.C.**
**Sherron Ashworth, 33rd J.D.C.**
**P. O. Drawer 839**
**Oberlin, LA 70655**
**Counsel for Appellee:**
      **State of Louisiana**

**PICKETT, Judge.**

On August 31, 2004, Samuel Delaney was charged by the grand jury of Allen Parish with two counts of aggravated rape, violations of La.R.S. 14:42, two counts of indecent behavior with a juvenile, violations of La.R.S. 14:81, and two counts of molestation of a juvenile, violations of La.R.S. 14:81.2. Trial commenced on August 21, 2006, and the defendant was found guilty as charged on all counts by a jury on August 25, 2006. The defendant was sentenced on December 8, 2006, to two terms of life imprisonment without the benefit of parole, probation or suspension of sentence on the two convictions for aggravated rape, ten years imprisonment at hard labor on the two convictions for molestation of a juvenile, and seven years imprisonment at hard labor for the two convictions for indecent behavior with a juvenile. All of the sentences were ordered to be served concurrently.

The defendant did not file a motion to reconsider the sentence. However, on December 5, 2006, the defendant filed a "Motion for New Trial and Incorporated Memorandum" and a "Motion for Post Verdict Judgment of Acquittal and Incorporated Memorandum." Both motions were heard prior to sentencing on December 8, 2006, and were denied in open court.

The defendant has perfected a timely appeal, alleging six assignments of error:

> 1. The trial court erred in refusing to allow the defense to present evidence of two instances of prior sexual assault by third parties on one of the alleged victims in this case.

> 2. The trial court erred in denying the motion for mistrial and failing to give an admonition based on a witness's reference to a purported unrelated offense.

> 3. The trial court erred in refusing to quash the indictment for duplicity.

1

4. The trial court erred in allowing Dr. John Simoneaux to testify as to the credibility of the complaining minors.

5. The trial court erred in allowing introduction of prior, purportedly consistent, statements by the alleged victims in the form of videotaped statements.

6. The trial court erred in denying the Motion for Post Verdict Judgment of Acquittal.

## FACTS:

The defendant lived with T.F. in his home in Allen Parish. T.F.'s youngest daughter, K.M., who initially lived with her father and visited her mother on the weekends, moved into the house a few months prior to the defendant being arrested for the offenses. T.F.'s oldest daughter, H.F., lived with her father, but visited her mother on the weekends. Between the months of August 2003 and February 2004, the defendant, individually, forced the two minor victims to have oral sex with him. He attempted to penetrate their vaginas with his penis and with a dildo. The defendant walked around the house with his penis exposed to one of the victims and made each of them watch a pornographic movie. He touched and rubbed their vaginas while they were in bed and made them masturbate him using hand lotion or Vaseline as a lubricant.

## ERRORS PATENT :

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER 6:

For his sixth assignment of error, the defendant asserts that the trial court should have granted his "Motion for Post Verdict Judgment of Acquittal" for the

2

reason that the evidence was insufficient to sustain the convictions of aggravated rape, molestation of a juvenile, and indecent behavior with a juvenile. In his motion and in brief to this court, the defendant argues that "[t]his is a case involving a sole issue of the credibility of the complaining alleged victims. There was no corroboration of their testimony from medical experts or otherwise."

We will address the defendant's sixth assignment of error first for the reason that should the evidence be insufficient to sustain the convictions, the defendant would be entitled to an acquittal and the remaining assignments of error would be moot. *Hudson v. Louisiana,* 450 U.S. 40, 101 S.Ct. 970 (1981).

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino,* 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

T.F., the mother of the two victims, testified at trial. She had been living with the defendant since March 2002. At the time she moved in with him, she did not have custody of her children, a son and daughter by R.M., Sr., and a daughter by B.L. The youngest daughter, K.M., and her brother, R.M., visited on the weekends. The oldest daughter, H.F., at first visited during the day once a week, then in August 2003,

3

began having weekend visitation. During this same time period, T.F. received custody of the K.M. and R.M., and they began to live full-time in the defendant's house.

T.F. stated that there had been an "R" rated movie in the house. She said that there were four movies on one tape, three kids movies, then a movie titled "Scoring." She said it contained only women's bare breasts. She said she did not want her son to see it so she taped over the movie.

In February 2004, H.F.'s father called T.F. and asked her to come over immediately. She went to his house with K.M. and R.M., and H.F. told her mother about the defendant's sexual abuse. They talked to H.F. by herself, then called K.M. into the room and questioned her. At this time, K.M. told her mother about what the defendant was doing to her. T.F. stated that later, after she got home, she questioned K.M. again and K.M. "told me that it wasn't true, that Sam wasn't doing anything and that [H.] was - I don't know - she said that [H.] had told her to do it." T.F. stated that a few weeks later, R.M. told her she had lied because she was jealous of the attention the defendant was giving to her brother. T.F. said that H.F.'s father called Children's Protection Services, and a woman came out to interview her, the defendant, R.M., and K.M. Because K.M. recanted the allegations, the investigation did not go further and T.F. continued to live with the defendant. However, H.F. never went back for visitation.

H.F.'s father, B.L., testified. Accordingly to B.L., his daughter first told her stepmother about the sexual abuse. He stated that he reported the offenses to the sheriff's department, but because he lived in one parish and the offenses took place

4

in another parish, it was four or five months before anyone took any action. Finally, he was contacted by the Children's Protection Services.

Children's Advocacy Program interviewed the two victims regarding the allegation of the offenses committed against them by the defendant. The tapes were submitted at trial as State's Exhibits 5 and 7.

At the time of the interview, K.M. was living again with her father. She was seven years old. She told the interviewer she was happy to be living with her father because there nothing bad could happen to her. She called genital areas "wrong spots" and said that Mr. Sam tried to stick his wrong spot into her wrong spot. He made her watch "nasty" movies of men and women who were naked. He kept the movie on top of the kitchen hutch and made her watch it repeatedly. He made her suck his wrong spot or rub it with her hands using a lotion or Vaseline as a lubricant. He went into her bedroom at times when her mother was sleeping and got into bed with her. He sometimes would kneel beside the bed and put his mouth on her wrong spot. She said that when he tried to penetrate her, it hurt. She told the interviewer that sometimes he would pee a "slimy" stuff from his wrong spot and that it tasted bad.

The defendant had a shed behind the house called the "cock house" where he kept his fighting roasters. He would take K.M. to the cock house and, after sitting her in a chair, would kneel in front of the chair and rub her wrong spot with his wrong spot. K.M. said that he told her if she told anyone, he would kill her and her sister, H.F. He told her this more than once. She said that she did not tell for two reasons: one, that she believed he would kill her and her sister, and two, that she did not think

5

anyone would believe her, and her mother would be kicked out of the house. She stated that even after the allegations were made, the abuse did not stop.

At trial, K.M.'s testimony was consistent with what she stated during the taped interview. On cross-examination, she admitted that after her initial allegations she told her mother and a social worker the allegations were not true, that her sister had told her to lie. She explained that later when she was confronted by her mother and the defendant, she told them the allegations were not true because she was scared of the defendant. Her mother then told her to tell the social worker that the allegations were not true. This admission was consistent with what she had told the interviewer from the Children's Advocacy Program in July 2004.

Tom LaHaye, a physician who specialized in obstetrics and gynecology, testified that he examined K.M. in July 2004. He found no external evidence of sexual abuse. He stated that the victim's hymen was intact, and there was no evidence of fondling.

R.M., K.M.'s brother and H.F.'s half-brother, testified that on one occasion he saw the defendant take K.M. out to the cock house, and when he asked to go with them, the defendant told him to go back to the house. Otherwise, he said he was not aware of any occurrence between the defendant and his two sisters.

H.F. was interviewed by the Children's Advocacy Program on August 5, 2004. She was ten at the time. She stated the abuse started sometime before Christmas 2003, when she started spending the weekends with her mother. She did not remember when it started, exactly how many times it happened, or when it ended. She spoke of one incident when, after T.F. asked the defendant to blow-dry her hair after a bath, the defendant made her kneel in front of him and suck his penis while he

6

blow-dried her hair. She said he would go into her bedroom early in the morning when her mother was still sleeping and rub her wrong spot. She said it hurt when he rubbed her. Once, he tried to stick a "brown thing" into her wrong spot. He went into her bedroom almost every time she spent the night. She related another incident which took place when her mother left the house to pick up K.M. and R.M. While she was sitting in a recliner in the living room watching TV, the defendant knelt in front of her and began licking her wrong spot. He then lay her on the floor and, while kneeling over her, forced her to suck his penis. She further said he would make her masturbate him using hand lotion that he kept by his chair in the living room as a lubricant.

H.F. said the defendant made her watch a movie of men and women sucking each other. She said the men "humped" the women. He kept the movie in a clear plastic box on top of the hutch in the kitchen. H.F. told the interviewer she did not tell because she was afraid she would not be able to see her mother anymore.

H.F.'s trial testimony was consistent with the information given in the taped interview. She further testified that the defendant ejaculated in her mouth. However, on cross-examination, she admitted that, during the taped interview, she had denied he ejaculated in her mouth.

John C. Simoneaux, a forensic psychologist, who specialized in child sexual abuse, conducted a psychological evaluation of H.F. and K.M. He testified that the victims' interviews were highly consistent with valid reports of sexual abuse. Doctor Simoneaux's testimony is discussed more at length below.

Jared Dobson, a trooper with the Louisiana State Police, Bureau of Investigations, was the lead investigator in this matter. He testified that he seized a

7

videotape he found which contained a movie showing full-frontal nudity of men and women simulating sex acts. The title of the movie was "Scoring." Tracy Morgan, a sergeant with the Louisiana State Police, testified that he located two jars of Vaseline in the cock house, one was a clear jell and one was a reddish colored jell. He also said he was present when a bottle of hand lotion was located next to a recliner in the living room.

The defendant testified. He was fifty years old at the time of trial. He was an electrician. He had been married for twenty-three years prior to living with T.F. and had three adult children. He categorically denied every allegation. He stated that he did not have much to do with H.F. because she lied and stole from him constantly. He stated H.F. hated him because he had helped T.F. in her bid to regain custody of K.M. and R.M., but not her. He explained he had Vaseline in the cock house because he used it as a base in which to mix medicine to apply to the roosters. He did not permit the children to go into the cock house because he was fearful the roosters would attack them. He had no knowledge of how the movie "Scoring" came into his possession, other than it could have been included in a box full of used tapes he purchased at a yard sale.

The defendant's daughter, Lisa Delaney Swarthout, testified her father was a good man, and had never touched her inappropriately. Connie Thompson, a financial advisor who had helped the defendant with financing, testified she had known him all her life and considered him to be an honest and upright person. Buddy Kelly, a contractor who had hired the defendant previously, testified as to his good reputation in the community, as did Shirley Fontenot, a dispatcher for the Oakdale Police Department.

8

As noted above, the defendant asserts the victims' testimonies were unsupported by physical evidence or corroborating testimony and was "so incredible that no rational juror would believe it."

In Louisiana jurisprudence, it has been consistently held:

> In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense.

*State v. Roca*, 03-1076, pp.11-12 (La.App. 5 Cir. 1/13/04), 866 So.2d 867, 874, *writ denied*, 04-583 (La. 7/2/04), 877 So.2d 143 (citation omitted) .

The victims' testimonies were consistent with each other's description of the defendant's behavior. Their testimonies were consistent with their statements made on the videotapes. According to the testimony of the two victims, their mothers and B.L., neither victim knew the other was being subjected to same sexual abuses by the defendant. They both described the movie and where he usually hid the movie. Trooper Dobson testified he located the pornographic tape. They both discussed the lubricants they had to use to masturbate the defendant and the location of the lubricants. The police officers testified they located the lubricants where the victims stated the lubricants were kept. There were no internal contradictions or irreconcilable conflicts with physical evidence.

**Aggravated rape:**

In order to convict the defendant of aggravated rape, the state had to show that the victims were below the age of thirteen at the time of the occurrence, and that the

defendant had anal, oral, or vaginal sexual intercourse with the victims. La.R.S. 14:42. Both victims testified they were below the age of thirteen at the time of the sexual acts. Both victims testified the defendant attempted to insert his penis into their vaginas. Any penetration, however slight, is sufficient. La.R.S. 14:41(B). Moreover, both victims testified he had oral sexual intercourse with them. The evidence was sufficient to convict the defendant of these offenses beyond a reasonable doubt.

**Molestation of a juvenile:**

In order to convict the defendant of molestation of a juvenile, the state had to show(1) that he was over the age of seventeen; (2) that he committed a lewd or lascivious act upon the person or in the presence of a child under the age of seventeen; (3) that he was more than two years older than the victim; (4) that he had the specific intent to arouse or gratify either the child's sexual desire or his own sexual desire; and (5) that he committed the lewd or lascivious act by use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. La.R.S. 14:81.2; *State v. Ellis,* 38,740 (La.App. 2 Cir. 8/18/04), 880 So.2d 214.

Specific intent is a state of mind and can be inferred from the accused's actions. *State v. Onstead,* 03-1413 (La.App. 5 Cir. 5/26/04), 875 So.2d 908. A lewd and lascivious act is defined as "an act . . . which is lustful, obscene, indecent, tending to deprave the morals in respect to sexual relations, and relating to sexual impurity or incontinence carried on in a wanton manner." *State v. Interiano,* 03-1760, p. 7 (La. 2/13/04), 868 So.2d 9, 15, quoting *State v. Holstead,* 354 So.2d 493, 498 (La.1977).

10

Further, the supreme court in *Interiano* stated that lewd and lascivious acts "encompasses not only the physical touching of the victim in an indecent manner, but also 'indecent sexual displays in the presence of children under the age of seventeen.'" *Id.* at 15.

In the case of K.M., she stated she did not tell because the defendant threatened to kill her and her sister if she told. She lived in his house and was afraid that if she resisted or told on him, he would kick her mother out of the house. Moreover, he would take her out to the cock house, which was his exclusive domain. On the videotape and at trial, she stated that he made her rub his penis using Vaseline as a lubricant. All the elements of molestation of a juvenile were shown and a jury could have found him guilty beyond a reasonable doubt.

H.F. stated on the videotape the defendant told her it was their little secret. She stated she was afraid to tell about the sexual abuse because she did not want to stop seeing her mother. In *State v. Mack*, 514 So.2d 567 (La.App. 4 Cir. 1987), the fourth circuit affirmed the conviction for molestation of a juvenile where the victim testified she was intimidated into acquiescing to the sexual activity because she was afraid she was going to be stranded in a strange place on a cold night without a way home. In this case, we find there was sufficient evidence for the jury to determine beyond a reasonable doubt that the defendant was guilty of the offense of molestation of a juvenile by use of psychological intimidation to get H.F. to acquiesce to his demands.

**Indecent behavior with a juvenile:**

In order to convict the defendant of indecent behavior with a juvenile the state had to prove (1) he committed any lewd or lascivious act; (2)the act was upon the

11

person or in the presence of any child under the age of 17; (3) that he was over the age of seventeen and more than two years older than the victim; and (4) that he had the intention of arousing or gratifying the sexual desires of either person. La.R.S. 14:81(A); *Ellis,* 880 So.2d 214.

We find noplace in the record where the state discussed at trial what conduct of the defendant constituted the offense of indecent behavior with a juvenile. However, in brief to this court (in response to an allegation of double jeopardy discussed below), the state argues the indecent behavior was that "the defendant forced the two victims to watch pornographic movies with him." After reviewing the facts we find the state did not meet its burden of proving the defendant committed the offense of indecent behavior.

In *State v. Gaspard*, 02-1040 (La.App. 3 Cir. 3/5/03), 841 So.2d 1021, this court held that without more, watching a pornographic movie with a juvenile was not "lewd and lascivious." In *Gaspard,* a father, during weekend visitations with his son, forced him to watch several pornographic movies. He also supplied his son with printed material depicting naked women. He would even pack magazines of naked women in the boy's suitcase when he went home from his weekend visitations. However, "[n]othing in the record indicates Defendant touched, or tried to touch, the boy or himself. There is no suggestion of nudity or physical exposure of any kind by either of them." *Id.* at 1024. The only act consisted of Gaspard showing the movies to his son.

This court held:

In this case, we find the conduct at issue does not even qualify as an "act" contemplated by the statute. However, assuming it was such an "act," Defendant's watching or showing the videos to his son was clearly not "lewd and lascivious" under *Louviere* [*State v. Louviere*, 602 So.2d

12

1042 (La.App. 4 Cir.1992), *writ denied*, 610 So.2d 796 (La.1993)]. Further, as required by La.R.S. 14:81, there was no evidence Defendant did anything "upon the person" of V.G. and Defendant did not participate in any lewd acts "in the presence of" V.G. Arguably, the actions depicted on the videos were "lewd and lascivious," but Defendant was not a participant in those actions.

Considering the discussion and the result in *Louviere*, it seems clear that the conduct at issue falls short of the conduct deemed criminal in La.R.S. 14:81. If "french kissing" does not qualify as attempted indecent behavior with a juvenile, we cannot say watching sexually-explicit videos qualifies. Regardless of how distasteful and morally debased Defendant's conduct was, the statute he was charged with violating required certain elements which are not present in this case. While the criminal code provides other offenses which may fit the acts of the Defendant herein, we are unable to speculate on those and must find him not guilty of the crime charged.

*Id.* at 1026. *See also State v. Peloguin,* 04-667 (La.App. 3 Cir. 11/17/04), 888 So.2d 393, *writ denied*, 04-3170 (La. 4/8/05), 898 So.2d 1280, wherein this court did not find a lewd and lascivious act when Peloguin asked the fourteen-year-old if she wanted to see his penis. The victim answered no and walked away. This court found no overt act committed upon the victim.

In the present case, neither victim testified at trial or on the videotapes that there was any touching, or suggestion of touching, or nudity while the movie was being watched. In fact, in her taped interview, K.M. was specifically asked if there was any sexual activity which occurred during the watching the movie, and she answered that they just watched the movie.

As noted, the state did not specify at trial what conduct constituted indecent behavior. Therefore, for the reasons discussed above, and for the reasons raised below in the defendant's assignment of error number three which raises issues of double jeopardy, we find that the state failed to prove the element of "lewd and lascivious" acts necessary to convict him of indecent behavior with a juvenile under the particular

13

factual scenario as set forth by the state in its brief in response to this appeal. Accordingly, this court hereby vacates the convictions of indecent behavior with a juvenile, and judgments of acquittal, are rendered as to these two counts. The sentences imposed for the two counts of indecent behavior with a juvenile are vacated.

## ASSIGNMENT OF ERROR NUMBER 1:

The defendant asserts the trial court erred when it denied his "In Camera Motion for Introduction of Evidence of Prior Act of Sexual Abuse Against Victim Pursuant to La.C.E. Article 412 (Rape Shield) and Assertion of Unconstitutionality of Article 412." The defendant's motion was filed on April 15, 2005. A hearing was held on April 26, 2005, and the motion was denied with written reasons.

In his motion, the defendant asserted H.F. was sexually assaulted by two different men who have been convicted of those offenses. He argued that the evidence was offered to show the following:

> 1) [A]s probable alternate source for the victim's account of the incidents alleged to have been committed by defendant, 2) to show the jury that the victim had been educated as to this type of sexual behavior, thereby offering an explanation as to a source from which the victim could have been educated as to this type of activity.

The trial court denied the motion and stated:

> Defendant asserts that the jury should be allowed to hear evidence of prior incidents of sexual molestation of the minor victim in this case. Further, defendant asserts that this evidence is critical to his defense in that it establishes a possible alternative source for the victim's familiarity with and/or knowledge of sexual information related to the acts allegedly committed by the defendant. Defendant insists that without this information being admitted into evidence, the jury would know of no other source in which a child of this age could have learned or been exposed to this type of information, and the jury could only believe that the child was subjected to such behavior by defendant.

> For reasons fully explained in *State v. Loyden,* 899 So.2d 166 (La.App. 3rd Cir. 2005), the Court finds that pursuant to Louisiana Code

14

of Evidence Article 412, evidence of the victim's prior molestation is not admissible in this matter.

The defendant argues in brief to this court that the trial court effectively denied him his right to present a defense as guaranteed him by the constitution. In *State v. Loyden,* 04-1558, p. 10 (La.App. 3 Cir. 4/6/05), 899 So.2d 166, 174, this court quoted *State v. Zeringue*, 03-697, pp. 13-14 (La.App. 5 Cir. 11/25/03), 862 So.2d 186, 195, *writ denied*, 03-3523 (La. 4/23/04), 870 So.2d 298, as follows:

> The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to be confronted with the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. *State v. Hillard*, 398 So.2d 1057, 1059 (La.1981).
>
> An accused also has a constitutional right to present a defense. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). As a general rule, a party may attack the credibility of a witness by examining him or her concerning any matter having a reasonable tendency to disprove the truthfulness of his or her testimony. LSA-C.E. art. 607(C). The right of an accused sex offender to present a defense is, however, balanced against the victim's interests under LSA-C.E. art. 412, which is meant to protect the victim of sexual assault from having her sexual history made public.

*See also State v. Everidge*, 96-2665 (La. 12/2/97), 702 So.2d 680.

Louisiana Code of Evidence Article 412 provides, in relevant part, as follows:

> A. Opinion and reputation evidence. When an accused is charged with a crime involving sexually assaultive behavior, reputation or opinion evidence of the past sexual behavior of the victim is not admissible.
>
> B. Other evidence; exceptions. When an accused is charged with a crime involving sexually assaultive behavior, evidence of specific instances of the victim's past sexual behavior is also not admissible except for:
>
> (1) Evidence of past sexual behavior with persons other than the accused, upon the issue of whether or not the accused was the source of

15

semen or injury, provided that such evidence is limited to a period not to exceed seventy-two hours prior to the time of the offense, and further provided that the jury be instructed at the time and in its final charge regarding the limited purpose for which the evidence is admitted; or

(2) Evidence of past sexual behavior with the accused offered by the accused upon the issue of whether or not the victim consented to the sexually assaultive behavior.

The defendant argues "that the proposed evidence of the prior assaults was not character evidence since the previous assaults involved no voluntary conduct on the part of H.F. and that Article 412 did not seek to prohibit 'non-character' evidence regarding the victim."

However, in this same factual situation wherein the victims had been subjected to prior sexual offenses, this court and other jurisdictions have consistently held that the rape shield statute's protection applies regardless whether it was non-character evidence the accused sought to introduce, unless one of the above-mentioned exceptions apply, or unless the accused's right to present a defense outweighs the victim's right to not have prior sexual activity revealed.

In *State v. Blue,* 591 So.2d 1173, (La.App. 1 Cir. 1991), *writ granted in part*, [sentence set aside and case remanded for compliance with La.Code Crim.P. art. 894.1] 591 So.2d 1172 (La.1992) Blue argued that the evidence of a prior molestation was offered to show the eleven-year-old victim's knowledge of what constituted sexual acts. The first circuit noted that "[i]n this case, the victim was not physically injured, and no semen or other such physical evidence was recovered. . . . Furthermore, consent was not an issue. . . ." *Id.* at 1177. The first circuit concluded, therefore, that the evidence of a prior sexual assault was irrelevant.

In *State v. Billings*, 93-1542 (La.App. 3 Cir. 5/4/94), 640 So.2d 500, *writ denied*, 94-1437 (La. 10/7/94), 644 So.2d 631, the accused sought to introduce

16

medical records showing that the "young victim already had inappropriate knowledge of certain sexual activities." *Id.* at 502. This court upheld the trial court's ruling that evidence of non-consensual sex between another man and the victim prior to the time in which it was alleged the accused had non-consensual sex with the victim was not relevant. *See also State v. Davis,* 95-801 (La.App. 3 Cir. 12/6/95), 664 So.2d 821; *Zeringue,* 862 So.2d 186, and *State v. Smith,* 04-1442, 04-1470 (La.App. 3 Cir. 2/2/05), 894 So.2d 564.

The defendant argues that cases such as this one pose "special problems. This is because any individual accused of any type of sexual assault of a minor faces a special challenge absent in cases involving adult complaints: the common assumption that a child has no way of knowing the mechanics of sexual activity, absent the guilt of the accused on the charges at issue at trial." The defendant's argument is strikingly similar to the argument presented to the first circuit in *State v. Michel*, 93-789, pp. 4-5 (La.App. 1 Cir. 3/11/94), 633 So.2d 941, 943:

In his brief to this Court, the defendant states:

The jury should have been allowed to hear evidence of a possible sexual molestation of this minor which occurred in 1988.... This evidence was critical in that it establishes a possible alternative source for the victim's account of the incident. If the child had, on a previous occasion, been sexually molested and had been educated as to this type of sexual behavior through this prior act, that fact may explain her vivid account of the incident that she gave at trial. Without this information being admitted into evidence, the jury would know of no other source in which a child of this age could have learned or been exposed to this type of information. The jury could only believe that the child was subjected to such behavior by this defendant. Had the jury been able to hear of prior acts of sexual molestation, they would have been aware of an alternative source of the victim's testimony which *significantly weakens the state's case* . . . .

17

The evidence is not being offered nor would the jury believe that the evidence is being offered to attack the child's character. Any prior sexual acts committed on this youngster were done involuntarily on the part of the child. Therefore, the jury would not see the fact that she has been molested on a prior occasion as a personal attack on her. She was only a victim. Indeed, evidence regarding prior molestations of this minor would make her a more sympathetic witness in the eyes of the jury....

Article 412 is intended to prevent or "shield" sex crime victims from having irrelevant, prejudicial, and embarrassing information about the victim's sexual activity brought out in trial. The article, by its clear terms, was not intended to exclude from evidence *involuntary* assaults previously perpetrated on the victim....

Involuntary sexual attacks, assaults, or forced acts committed against the victim would not and could not impugn someone's character. Since such acts are "involuntary," the fact that they occurred in no way reflect [sic] on the "character" of the victim. Given this fact, Article 412 was not intended to exclude prior involuntary sexual assaults committed upon the victim. (Defendant's brief, pp. 10-13).

The first circuit found no merit to Michel's argument for the following reasons:

The defendant admits that this issue was raised and rejected in *State v. Blue,* 591 So.2d 1173 (La.App. 1st Cir.1991), *writ granted in part and denied in part,* 591 So.2d 1172 (La.1992). However, he argues that the decision in *State v. Blue* did not consider the intent of Article 412, which is primarily designed to protect victims of sexual abuse from unwarranted investigations of their past sexual behavior and improper attacks upon their character and reputation. We have carefully considered the defendant's interesting argument regarding the applicability and intent of Article 412. We also have considered the defendant's constitutional right to present a defense. In this case, had the victim's testimony been the only evidence identifying him as the perpetrator, the defendant's constitutional right to present a defense *might* have overcome a rigid application of Article 412 preventing any exploration of specific instances of the victim's past sexual behavior. However, an examination of the facts of the instant offense confirms our decision that Article 412 was correctly applied in this case to prevent any exploration of a possible sexual molestation of the victim in 1988. The defendant was discovered in the victim's bed. Both of them were naked from the waist down. When ordered out of her bed by the deputies, the defendant was observed to have a liquid substance dripping from his erect penis.

18

> Considering these facts, we find that the instant case is not distinguishable from the situation presented in *State v. Blue* and, therefore, we conclude that the trial court correctly prevented any exploration of an alleged prior act of sexual abuse of the victim.

*Id.* at 943-44.

While there was no corroborating eyewitness evidence, as in the case of *Michel*, where the accused and victim were half-clothed and in bed when they were discovered, in the current case there were corroborating facts given by H.F. which were substantiated by the investigating officers. The victim testified regarding the pornographic movie she was shown by the defendant. She further described the hand lotion, which was located where she said it could be found. Furthermore, the possession of the pornographic movie and its location were corroborated by K.M., who was also forced to watch the movie at different times than her sister. Finally, there was H.F.'s sister, who alleged identical sexual abuse during the same time period, under the same circumstances, and who had not been exposed to prior sexual assault as H.F.

As in *Blue*, in the present case there were no issues of who deposited the semen or caused the injuries, nor was there an issue of consent. Therefore, the exceptions to the rape shield statute did not apply for those reasons. The trial court did not err when it denied the defendant's motion and ruled that H.F.'s prior sexual assaults were protected information pursuant to La.Code Evid. art. 412.

In the defendant's "In Camera Motion for Introduction of Evidence of Prior Act of Sexual Abuse Against Victim Pursuant to La.C.E. Article 412 (Rape Shield) and Assertion of Unconstitutionality of Article 412," he asserted, "defendant urges the unconstitutionality of Louisiana Code of Evidence Article 412, in that the legislative intent of said Article was not intended to exclude from evidence involuntary sexual

19

assaults previously perpetrated on a victim." The defendant further argued that if the article was so "interpreted to include <u>involuntary</u> sexual assault, Louisiana Code of Evidence Article 412 prevents and/or prohibits defendant from presenting a defense, a constitutional right guaranteed by the United States Constitution, Fifth, Sixth and Fourteenth Amendments and Louisiana Constitution, Article I, Section 16."

A hearing on the defendant's motion was held on April 26, 2005. The motion was taken under advisement. In its ruling, the trial court denied the motion pursuant to Article 412 and did not address the question of constitutionality. In his brief to this court, the defendant does not directly challenge the constitutionality of the statute, but discusses only whether application of the statute in this case impinges on his constitutional right to present a defense.

> It is well established that statutes are presumed to be valid, and the constitutionality of a statute should be upheld whenever possible. *State v. Griffin*, 495 So.2d 1306, 1308 (La.1986) (citations omitted). Because a state statute is presumed constitutional, the party challenging the statute bears the burden of proving its unconstitutionality. The attack will fail if the court determines that a reasonable relationship between the law and the promotion or protection of a public good, such as health, safety or welfare exists. *Theriot v. Terrebonne Parish Police Jury*, 436 So.2d 515 (La.1983).

*State v. Brenan*, 99-2291, p. 3 (La. 5/16/00), 772 So.2d 64, 67.

In *Billings*, and in *State v. Hotoph*, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, *writs denied*, 99-3477 (La. 6/30/00), 765 So.2d 1062 and 00-150 (La. 6/30/00), 765 So.2d 1066 , this court and the fifth circuit discussed the constitutionality of the notice requirement for invoking the exception provision of Article 412. In *Hotoph,* the fifth circuit noted:

> In *Michigan v. Lucas*, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), the United States Supreme Court upheld a similar notice and hearing requirement, finding it constitutional and noting that, **to the extent that a rape shield statute operates to prevent a criminal**

**defendant from presenting relevant evidence, the defendant's ability to confront adverse witnesses and present a defense is diminished, but this does not necessarily render the statute unconstitutional**. 500 U.S. at 148, 111 S.Ct. at 1746. This rationale was followed by the Third Circuit in *State v. Billings*, 93-1542 (La.App. 3rd Cir.5/4/94), 640 So.2d 500, *writ denied*, 94-1437 (La.10/7/94), 644 So.2d 631.

*Id.* at 1047 (emphasis added).

The defendant did not meet his burden of rebutting the presumption of the constitutionality of Article 412. Accordingly, there is no merit to this assignment of error.

## ASSIGNMENT OF ERROR NUMBER 2:

The defendant argues that the trial court erred when it denied his motion for a new trial. The defendant filed a "Motion for New Trial and Incorporated Memorandum" on December 5, 2006. The defendant asserted several trial errors which he argued warranted a new trial. Specifically, for this assignment of error, the defendant complains of an inadvertent statement made during trial by the victims' mother which could be construed as impermissible other crimes evidence. After being asked why she continued to live with the defendant after the allegations of sexual abuse surfaced, the witness stated:

> A. After he was arrested the first time, [K.] would keep on changing her story and I wasn't sure whether or not it was true. He had bonded out the first time. And when he had bonded out, he had told me that as long as I stuck by his side, my kids would be safe. So I made it look like I believed him instead of my children so I could make sure that he didn't put a hit on them like he did to their daddies.

> MR. GRAVEL: Objection. May we approach. (Discussion had at the bench was out of the hearing of the jury.) Reference to other crimes. I move for a mistrial.

> MR. GREEN: I didn't ask the question.

21

MR. GRAVEL: Judge, for her to blurt out and to say that he put a hit on someone, when she had never said it before. She's in this courtroom today. That's so prejudicial.

THE COURT: I'll tell the jury that the last part was non-responsive and I'll order it to be stricken. Your motion for mistrial is denied. The last part of her testimony concerning what Mr. Delaney did concerning her ex-husband is stricken from the record and not to be considered. It was non-responsive to what the District Attorney asked.

The defendant further argued that the trial court erred when it did not properly admonish the jury regarding the statement.

The defendant's motion for a new trial was heard on December 8, 2006, at which time the motion was denied. However, the defendant requested that the trial court reinstate the stricken testimony for the purpose of appeal and the trial court complied.

Generally, evidence of other crimes, wrongs, or bad acts is not admissible at trial. La.Code Evid. art. 404(B). Moreover, even if the evidence may be relevant, it may be excluded if the probative value of the offense is substantially outweighed by the prejudicial value or if it is misleading to the jury. La.Code Evid. art. 403.

Louisiana Code of Criminal Procedure Article 771, in relevant part, provides:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

. . . .

(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

22

In *State v. Willis*, 05-218 pp. 32-33 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, 389, *writ denied*, 06-186 (La.6/23/06), 930 So.2d 973, *cert. denied*, --- U.S. ----, 127 S.Ct. 668 (2006) while discussing other crimes evidence, this court stated:

> [t]he erroneous admission of other crimes evidence is subject to harmless error analysis under the standard set out in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See State v. Gibson*, 391 So.2d 421 (La.1980). Under *Chapman*, an appellate court must decide "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," and "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824.
>
> The *Chapman* standard was later refined in *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), as follows:
>
> > "Consistent with the jury-trial guarantee, the question [*Chapman* ] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand.... The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (emphasis in original).

*State v. Bell,* 99-3278, pp. 5-6 (La.12/8/00), 776 So.2d 418, 421-22.

Despite the defendant's assertion otherwise, as noted above, the record indicates that the trial court did advise the jury that the remark made by the witness was to be disregarded. Moreover, the defendant did not request that the jury be so admonished. Further, on cross-examination, the defendant questioned the witness regarding her statement, thereby bringing the allegation again to the jury's attention. Finally, regardless that the one initial comment may have been inadmissible, the error is harmless as suggested in *Willis*. An error is harmless if the guilty verdict rendered in the case is surely unattributable to the error. As noted in assignment of error number six, discussed above, the evidence submitted was such that even without the erroneous

23

statement, the victims' testimonies and other corroborating facts were sufficient to sustain the verdicts.

Accordingly, the trial court did not err when it denied the defendant's motion for a new trial based on the erroneous admission of other bad acts. There is no merit to this assignment.

**ASSIGNMENT OF ERROR NUMBER 3:**

On February 24, 2005, the defendant filed a "Motion to Quash on Basis of Duplicity." A hearing was held on April 26, 2005, wherein the trial court denied the defendant's motion. In brief to the trial court, the defendant alleged that the charges of molestation of a juvenile and indecent behavior with a juvenile were based on the "same transaction/incident and/or circumstances; under the approach/theory relied on by the State, Molestation of a Juvenile could not be committed without the accompanying crime of Indecent Behavior with a Juvenile."

As discussed above, in response to this allegation, the state asserts that the indecent behavior involved the watching of the pornographic movie with the victims. However, because the state failed to establish the necessary lewd and lascivious element of indecent behavior, this court has reversed the convictions for indecent behavior. Accordingly, this assignment of error is moot.

**ASSIGNMENT OF ERROR NUMBER 4:**

For his fourth assignment of error, the defendant asserts the trial court erred when it permitted Doctor John Simoneaux, an expert in child abuse matters, to comment on the victims' credibility. The defendant argues that Doctor Simoneaux's statements impermissibly bolstered the victims' testimonies and usurped the credibility determination that was the province of the jury.

24

The role of an expert witness in criminal matters involving sexual abuse of children has been well defined:

> The purpose of an expert witness in a criminal case is to provide the jurors with a basis of knowledge and background information on a subject. The jury as the ultimate fact finder should relate background knowledge received from the expert to the facts established by the evidence at trial, and make a determination of the defendant's guilt. *State v. Soler*, 93-1042, p. 11 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1080, *writ denied*, 94-1361 (La.11/4/94), 644 So.2d 1055.

> La. C.E. art. 702 provides that a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. La. C.E. art. 704 provides:

>> Testimony in the form of an opinion or inference other-wise [sic] admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.

> Expert testimony can assist a jury in understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosure, reluctance to testify, and recantation. *State v. Chauvin*, 02-1188 (La.5/20/03), 846 So.2d 697. *See also, State v. Foret*, 628 So.2d 1116 (La.1993). An expert witness can explain to the jury that a child-witness's seemingly abnormal behavior such as delayed reporting, inconsistent statements, and recantation is normal for children who have been sexually abused and can also dispel jurors inaccurate perceptions allowing them to better assess a child-witness's testimony. *State v. Chauvin*, 846 So.2d at 702-703.

> The proper presentation of the expert testimony must focus on explaining to a jury why "superficially bizarre" reactions such as delayed reporting, and the like take place in such cases. *State v. Foret,* 628 So.2d at 1130. *See also, State v. Chauvin, supra; State v. Ste. Marie*, 97-0168 (La.App. 3 Cir. 4/18/01), 801 So.2d 424, 428, *appeal after remand on other grounds*, 01-1253 (La.App. 3 Cir. 4/10/02), 824 So.2d 358, *writ denied*, 02-1117 (La.12/19/02), 835 So.2d 1288. The expert's opinion testimony must explain in general the behavioral characteristics of child abuse victims in disclosing alleged incidents without giving an opinion directly concerning the particular victim's credibility. *State v. Foret*, 628 So.2d at 1130; *State v. Ste. Marie*, 801 So.2d at 429.

25

If the expert's testimony is properly limited in this fashion, then it is of assistance to the jury in evaluating the psychological dynamics and resulting behavior patterns of alleged victims of child sexual abuse. *State v. Foret,* 628 So.2d at 1130. The expert's testimony concerning why victims might recant or delay reporting offered to rebut attacks on the victim's credibility is proper, so long as the expert limits his testimony to the general characteristics that explain delays in reporting, recantations, and omission of details. *Id.* The expert cannot substitute his estimation of the child's credibility for that of the jury. The expert testimony can only provide a scientific perspective for the jury to evaluate the child's testimony for itself. *Id.*

*State v. Myles,* 04-434, pp. 10-11 (La.App. 5 Cir. 10/12/04), 887 So.2d 118, 125.

The defendant states that "while some of Dr. Simoneaux's testimony was within the rule of *Foret,* a disturbing majority of his testimony was nothing more than a commentary on why, in his opinion, the children were telling the truth."

Initially, we note the defendant did not make objections to the specific statements he claims were inadmissible under *Foret.* The defendant objected once at the beginning of the doctor's testimony when the doctor was asked if he had "an expert opinion as to her [K.M.] psychological evaluation?"

A. You know--You know, if you're asking me if I'm absolutely certain if [K.] is telling the truth, I'm not. . .

MR. GRAVEL: Your Honor. . .

THE COURT: Hold up. There's an objection. (Discussion had at the bench was out of the hearing of the jury.)

MR. GRAVEL: I'm going to object to him testifying as to the truthfulness. . .

MR. GREEN: I wasn't trying to ask that question.

THE COURT: That's sustained.

Q. Have you formed an expert opinion as to her statement-- whether or not her statement would be consistent in the dynamics of sexual abuse that you [sic] seen?

26

A. Her statement was very consistent with what I have seen and what I have later learned to be valid reports of sexual abuse, yes.

None of the subsequent statements to which the defendant now objects were objected to at trial. Louisiana Code of Criminal Procedure Article 841 provides:

A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefore.

We find no error in the trial court's ruling regarding the question to which the objection was made. We will not consider the subsequent statements as there were no contemporaneous objections made, and thus these issues were not preserved for appeal.

This assignment of error is without merit.

**ASSIGNMENT OF ERROR NUMBER 5:**

For his fifth assignment of error, the defendant argues that the admission of the videotapes which contain consistent statements violated his right to a fair trial. The defendant asserts the only purpose of the admission of the tapes was to "bolster the veracity of the children."

The defendant asserts in brief that he "objected far in advance to the introduction of the first tape on the basis of bolstering." However, he did not object to the admission of the two videotapes at trial and therefore is precluded from raising the issue on appeal. La.Code Crim.P. art. 841. The defendant points to the record wherein Jolynn Doland, a social worker who works with Children's Advocacy Program and the person who interviewed H.F., was asked, "and what can you tell us

27

about the interview that you gave--that you had with [H.]?" The following conversation then took place:

> MR. GRAVEL: May we approach, please?

> THE COURT: Yes. (Discussion had at the bench was out of the hearing of the jury.)

> MR. GRAVEL: Judge, I'm going to object. It sounds to me that she's getting ready to--as far as her testimony, that she's getting ready to vouch for the credibility because they went through this interview process. She's everything [sic] talked about everything else, but if she's giving a summation about "everything that I did, she's credible and it's true" then I think that's improper. That's a dirty question.

> THE COURT: and where are you going with that?

> MR. GREEN: I was going to ask whether or not she had -- comparing this to other interviews, was there spontaneity, was there all of the other procedures that she talked about, were the questions not leading, was she spontaneous.

> MR. GRAVEL: Right.

> THE COURT: However, testifying to the truthfulness or non-truthfulness of the child, I'm not going to allow that. (Inaudible) foundation, the tape being videoed--the tape being admissible in court.

> MR. GRAVEL: It just appeared that she was getting ready to say. . .

> MR. GREEN: (Inaudible) credibility that I was getting into was if the child was spontaneous as far as. . .

> THE COURT: (Inaudible) but again, I'll caution you not to ask that question.

Following Ms. Doland's testimony, the victim H.F. testified. Following her testimony, the state published the first videotape, the interview with H.F. When asked if there were any objections, the defendant answered, "I don't have a problem with that, Judge."

After several more witnesses testified, and after laying a foundation for the second videotape with a second Children's Advocacy interviewer, the state sought to publish the second videotape. At this point, the defendant objected to the tape being published "for the purpose of educating her. It's similar to asking leading questions and suggesting the answers for her to sit and view the video and then to testify so that Mr. Green can then come back." Following discussion with the trial court and defense counsel, the state agreed to put the victim on the stand before publishing the video to the jury. Following K.M.'s testimony, the state offered publication of the videotape. At this time, the defendant had no objections.

The defendant did not object to the publication of the videotapes on the grounds the tapes bolstered the victims' testimonies. As noted, an error or irregularity must be objected to at the time of the occurrence and grounds must be stated for the objection. Once an objection is made, an accused is limited on appeal to those grounds articulated at trial. La.Code Crim.P. art. 841(A). *State v. Dean,* 00-199 (La.App. 4 Cir. 3/14/01), 789 So.2d 602, *writ denied,* 01-1177 (La. 3/15/02), 811 So.2d 897.

There is no merit to this assignment.

## CONCLUSION

In the case of both victims, this court affirms the two convictions of aggravated rape. In the case of both victims, this court affirms both convictions for molestation of a juvenile. Finally, this court reverses both convictions for indecent behavior with a juvenile. Under the factual scenario set forth by the state, the state failed to establish the element of lewd and lascivious behavior necessary for this offense.

**AFFIRMED IN PART; REVERSED IN PART.**